We'll hear argument this morning first in Case 12-17, McBurney v. Young. Mr. Gupta. Thank you, and may it please the Court. All 50 States have public records laws. Forty-seven of those States make access available to residents and nonresidents on equal terms. Virginia, by contrast, enforces a discriminatory access policy. And because commercial requesters make up the vast majority of records requesters, out-of-State businesses bear the brunt of Virginia's policy. Scalia, when was the first of those laws enacted, do you know? I think it's in my adult lifetime that Florida was the first to enact a Sunshine Law. Am I correct about that? That's right. All of these laws were in the 60s and the early 70s. The Virginia law was enacted in 1968. And we don't deny that. Scalia, I didn't say that's a fundamental right covered by privileges and immunities clause, which nobody had until the 1960s. Well, to be clear, the modern transparency laws are new, but they sit on top of well-established common law rights to access that are based not on modern notions of transparency, but on the right to secure property and other basic interests. But those rights still exist in this State, don't they? Can't you get records of deeds and whatever the common law would have covered? Well, it's true that Virginia's law exempts deeds from its freedom of information law, but if I understand their position correctly, they would be entitled as a constitutional matter, under their theory, to preclude people from other States from accessing even deeds. I didn't understand that to be their position, but I guess we can ask. Well, my client, Mr. Hurlburt, is in the business of gathering property records for his clients. Now, it's true that in Virginia he could get the deed, but what he can't get and what he principally gathers for his clients are real estate tax assessment records. And those are a much richer storehouse of property-related information than some of the deeds. And you can explain that business a little more fully than you did in the brief. He's in the business of collecting records from all the States about tax assessments. That's right. And he does that for a client who could very well ask himself. So what is the service that's being performed? Well, you know, he doesn't just do the routine request. The large data companies are the ones who hire him. And they, if there are routine requests, they can do them themselves, although if they're not based in Virginia, they would still have to hire a Virginian to do it. But they bring him in when there's some flaw in the routine process, where the State is being recalcitrant or the local official is being recalcitrant, and he's an expert in being able to gather these records and knowing the processes, knowing what he's allowed to do and what he's not allowed to do. All he has to do is get somebody from Virginia to ask for him, right? Well, he could hire someone from Virginia to do that, but that's, you know, that's sort of precisely what the — No, but you don't have to pay the person too much. He just has to write a letter saying, give me these documents, right? He would still have to hire someone, and that would be an increased cost. And for the first — Well, an increased cost of, I don't know how much, $100, right? Go write a letter, say you want these documents, and when they come to your house, give them to me. Yeah. For the large data companies, you know, they will hire someone other than him to perform this service. They will, if you're talking about routine requests. But even, you know, even for them, if you're talking about a request that isn't routine, if he has to do something further to enforce the rights, he's going to have to do that in his own name, or the data company will have to hire someone other than him, someone based in Virginia, to do that for them, and then he will lose that business. So the lower you go down in the food chain of the data industry, the bigger the effect of Virginia's policy. Ginsburg. How much of an impact, in fact, does it have on his business? I mean, there are 47 States that would provide this information. Well, for him, in the Virginia market, it completely forecloses him from doing business in the Virginia market. And if other States were to have policies like this, he wouldn't be able to do business in those States as well. So if the focus is on him and his business in Virginia, it completely cuts him off. If the focus is on what the effect is in the aggregate, on the market as a whole, because most public records requests are commercial requests, it's going to have an effect on most commercial requesters who are out of State. And an example of this is the law in Virginia, and it's the law in the State of Virginia. Scalia, I understand that the reasoning of Virginia in not allowing out-of-State people to get these FOIA requests is the following, that the purpose of these laws, and I remember it when the first ones were enacted, government in the sunshine. The purpose of it was not to enable people to get information per se. It was to enable people to see how their government is working so that they could attend to any malfeasance that is occurring in the process of government. It seems to me entirely in accord with that purpose of these laws to say it's only Virginia citizens who are concerned about the functioning of Virginia government and ought to be able to get whatever records Virginia agencies have. What's wrong with that? A few responses, Justice Scalia. First, transparency was one purpose, but as I said, these laws also carried forward the much more longstanding rights to access based on personal interests and property interests. Also, even at the time that these laws were enacted, if you don't need any personal or property interest under these laws, you can just out of curiosity, if you are a Virginian at least, in Virginia, even though you have no interest in the matter at all, you can ask the agency for records about this or that. It can't be based on the traditional property interest. It's based on the ability of the citizens of the State to find out what the government of the State is up to. Even at the time that these laws were enacted in the 60s, it was well understood that they were going to have a big commercial impact. The property records industry was in full swing by the end of the late 19th century. Ginsburg. But the point is that the FOIA is tied to, as Justice Scalia said, the citizens should know what their government is doing, and you don't have to give any reason at all if you are part of that political community. Now, Virginia doesn't allow people from out of State to vote. They are not part of Virginia's political community. So why isn't this, if you are not part of the political community, then you don't fall under FOIA, which is a pecuniary statute in that everybody who is covered by it can get whatever they want and not have to give any reason for it. Right. Well, elections just simply don't work if you allow noncitizens to participate in elections or if you can't wall off the State in that respect. But what the State can't say is simply because one purpose of this law is that we want to constitute ourselves as a political community, that we can exclude activities that have a big commercial effect. And, you know, when we are looking under the Dormant Commerce Clause or under the Privileges and Immunities Clause, this Court's cases have said repeatedly, you don't look to uncover the original legislative purpose. You look to whether there is discrimination, which there is here on its face, and you look to whether there is a discriminatory effect. One example of how this policy would actually be. Kagan Is the only thing that's necessary that the law affect a few people commercially? I mean, how much, how many of the requesters have to be engaged in some kind of commercial activity in order for your arguments to work? Well, what this Court has said is that there is no de minimis exception if there is discrimination against commerce. But here what's going on is anything but de minimis. Virginia does not deny that the vast majority of the requesters are commercial requesters. The vast majority of out-of-State requesters are commercial requesters. The amicus brief supporting their side, the local government attorneys of Virginia amicus brief at page 30, explains the way this policy is being implemented, is that noncommercial requests are typically honored, but out-of-State requests by data miners are being categorically denied under the policy. Roberts This is not a regulation of commerce. It's a State practice that may have an incidental effect on commerce, and the incidental effect may be disproportionate, depending upon whether you're State or local. But it's not a regulation of commerce. That's the Fourth Circuit's theory, and I think incidental can mean a few different things. And I think in their opinion it does mean at least three different things. So maybe it would be helpful if I try to unpack that. If it means incidental in terms of the effect on my client's business, I think as I've explained, it's anything but incidental. It completely forecloses him from the market. If it means incidental in terms of the aggregate effect of this statute, again, it's not incidental because the vast majority of affected parties under this policy are out-of-State commercial requesters, particularly data companies. And, you know, if it means incidental compared to the purpose of the statute, then, as I've said, transparency was one purpose of the modern FOIA laws, but they also subsumed and sit on top of all of the longstanding rights of public access that have been around since the first settlements in the United States, or before the United States, when in order to have a functioning property system, we recognized that you've got to have records of who owns what, and those records have to be made available to anyone in order to exercise property rights. Roberts What if the State of Virginia says as a policy we want to help Virginia businesses? And so we're going to open a business training, best practices institute where you're going to learn how to be a better business person, but the only people who can come in are Virginia businesses. Under your theory, because that will have an effect, an incidental effect, on commerce in a way that's discriminatory, is that unconstitutional? I don't think so, and I think there are a couple of distinctions. First, that's not something that the State exclusively is able to provide. It's not like the courthouse or the public archives across the street or the road that runs between them, that only the State is able to provide. Anyone can provide a business training institute. So the State is just one player among many. Also, running a ---- Scalia, that just goes to the extent of the impact, not on the principle. And you say extent doesn't matter. You say there's no such thing as a de minimis exception. So that explanation doesn't seem to me to hold water. Well, maybe I didn't explain it very well. To be clear, I think it's more than just a difference in degree. It's a difference in kind. These are fundamentally different. When you're talking about running the courthouse or running the public archives, nobody else can do that. Nobody else can collect, you know, make tax assessments, collect those records, and keep the official public archive of those things. So what? So what? Except to the extent that that bears upon how much of an imposition this is upon interstate commerce. It seems to me that's the only relevance of that point. And you dismiss that relevance. You say it doesn't matter how extensive the impact is on interstate commerce. Well, to the extent that you think it does matter, I mean, that distinction doesn't matter in this case, because the impact is great. The principal impact is an impact on out-of-State commerce. But let me just say. When you're talking about impact, is that a Pike analysis? No. I think this would, if you were in the Dormant Commerce Clause, this would be the per se rule of invalidity. You have facial discrimination. Well, I thought if it was facial discrimination, you're not concerned about impact. That's right. I thought a question of talking about the effects on interstate commerce, that's the, you know, the Pike analysis. No. What this Court has said is that the first sort of first-tier scrutiny, the per se rule, is for cases where there's discrimination on its face or discrimination in effect. And then you've got this other category for the Pike analysis where the State regulates even-handedly. But that says it's not. What's your closest case in support of the proposition that this is impermissible as a discrimination against interstate commerce? What's your best case? When you say this, you mean that public records access is common? If you are arguing, as one of your arguments here, that this is discriminatory as to interstate commerce, as I understand your argument, what is the best case you have to support your position? What's the closest case? Well, I think if you're — if the question is about whether or not records access is commerce, there's Reno v. Condon, this Court's unanimous position. Kennedy, my question is, what's the best case you have for your argument? Well, I think, you know, this Court's unanimous decision in Reno v. Condon held that because people buy public records and sell them in interstate commerce, that's indisputably interstate commerce. So we need to be able to support that. But that wasn't a discrimination. That wasn't a — that's just — that goes to the question whether or not this is commerce. That's right. What is your best case to show that this is discriminatory in violation of our precedents? Well, Virginia doesn't deny that there's discrimination on its face. So I take your question to be asking, you know, what about the commerce aspect? And Reno v. Condon's answer is that. If I have to write the opinion, what case do I put down? I'm waiting. Yeah. I mean, okay. So you can also look to Camp's Newfound, which I think, you know, was much — much more attenuated to commerce. There you had a generally applicable law, a property — If I only have time to read one case or possibly two, which would you like me to read? I think that's basically the question. I mean, you know, look, there's no case that's entirely on all fours. I assume you don't want me to stand here. Right. So, okay. So the Camp's Newfound case is a case where you had a generally applicable law. It was a property tax law. It exempted, you know, charities that served primarily in-State residents. It was — there's no evidence that the State of Maine intended that to be, you know, a discrimination against commerce. It obviously swept more broadly and affected both commerce and non-commerce. But this Court said that, you know, you had facial discrimination against commerce because there were people operating these summer camps and they were treated differently. Look at those. But I think the Commerce Clause basically has as its objective, insofar as it's dormant, to prevent a legislature or decisionmaker within its State discriminating in favor of their own State producers. Right. Now, it's pretty hard for me to put this case into that mold. Well, I mean, you know, one piece of evidence, Justice Breyer, is the media exception to the Virginia statute. It — this makes it clear that Virginia was aware that people who were requesting information for commercial purposes were going to use this statute. And they exempted the person— It's just Virginia media, though, isn't it? Isn't it only media that— That's right, Justice Scalia. —exists or broadcast into Virginia? That's right. So it's— Well, it's a pretty unusual statute that discriminates among newspapers. So it says— If it does, but the — I had exactly the same question for both parts of your argument, that what it's — am I right in thinking that anyone can get any information, anyone in any State can get any information that pertains to him or her? Is that right or not? There's a separate Virginia statute. Is that right or not? Yes. There's a separate Virginia statute in Alaska. Okay. That's what I wanted to know, whether it's separate or not. Anyone from Alaska to Hawaii can get any information that pertains to him or her. Second, that this has nothing to do with judicial records. There is a different statute that makes judicial records public. That's correct. Okay. So we're now talking about the class of information other than the two classes I've mentioned. And I then ended up, and I'd like you to add something to this if you can, that really this is about, since getting information involves usually a benefit to the recipient, but sometimes harm to the person the information is about, that willing to run that harm and risk of harm is the interest in State good government. Okay? Mm-hmm. Now, if that's the interest, that's an interest that probably a State has the right, just as it has the right to say other people can't vote in State elections. If that's the interest, then I guess it could take reasonable measures related to that interest. All right. Now, that is the argument or the position that I would appreciate your addressing. Sure. You know, we don't deny that that's an interest that the State has. But then you have to see whether the interest is reasonably furthered by the statute. And here you have a resource that is not finite, and the statute allows the State to recoup its expenses. So nothing is lost to Virginians. There isn't any loss in transparency to Virginians by extending access to out-of-State data companies. But it's a cost for Virginia. Virginia has to take care of its own. And if it has to service FOIA requests from all over, it's going to cost the State. It's going to have to hire people to do this. They're going to have to spend many hours going through these records. So the State doesn't – it wants to conserve its resources for its own people. But there's no loss in resources, Justice Ginsburg, because the statute allows Virginia to fully recoup any administrative expenses. Sotomayor, but they just don't want outlanders mucking around in Virginia government. It's perfectly okay for good old Virginians to do that, but they don't want outlanders to do it. Why is that unreasonable? Yeah, that is certainly their interest, but you've got to see whether the policy serves, you know, the interest. And this is a statute that's supposed to promote transparency. It actually makes it less transparent. Sotomayor, there is underlying your argument a sort of fundamental belief that you're entitled to relief, pardon the alliteration, simply because the statute discriminates between citizens and noncitizens. Is that your position? No, not at all. I mean, so if it's not, what are the two rights that you – or what rights are it that you're claiming have been violated? You say privileges and immunities. What's the privilege or immunity? It's the privilege or immunity of pursuing a common calling across State borders. So there's no dispute here that Mr. Hurlburt's common calling is gathering data. In fact, those are the principal users of public records law. So is this a as-applied challenge? That's right. All right. So this is an as-applied challenge. Yes. So it's an as-applied challenge with respect to Mr. Hurlburt's common calling. There's no – there's no dispute that that is his common calling and that this law has the effect of completely cutting him off from pursuing his common calling in the Virginia market. And that 47 other states do the same thing. And you would be doing something very strange with this statute, because you would be saying Hurlburt has a right to this because it's his business, but the statute, the character of this statute is it doesn't matter what you want the information for. But you're saying the out-of-state or it doesn't matter. Out-of-state, is it your argument that if the out-of-state has a good reason for getting this and it's related to the out-of-state of business, so you're changing the character of a FOIA statute, which is it doesn't matter what you want it for. Right. I mean, you would – you know, we would ask that you rule that the statute is unconstitutional as applied to him, and then Virginia would have the choice about how to use the statute. Sotomayor, I'm having a problem, and I think it's Justice Ginsburg's problem, which is absent the statute. He can't demand that Virginia provide him with this information because that's how he wants to work, correct? So what's the added value that gives him a right to demand it merely because the statute exists? He doesn't have a right to the information. Well, he's – all he's asking for is information that's available in the public archives on equal terms with Virginians. In the same way that someone who – Breyer, he has a very reasonable request, in my view. But the question isn't the reasonableness of his request. The question is, you know, whether they can do it. And the way that the work – the thing that's bothering me on the work part is this. It seems that the work is sort of tailored to the statute. It's in this way. I have a job, and my job is to study election processes. And I write reports, and I find amazing things about differences among States there, truly amazing. And I say, you know, it would help me a lot if I was actually a voter in each of these States. That would help my job. It would lend authenticity, and I could learn things that I probably couldn't learn otherwise. Now, does that add anything to the argument? I mean, I don't think so, but it sounds a little bit like you're making that kind of argument. And they either do have the right or they don't. And I don't know that it helps that I say, well, I really want it for my work. Right. But this is a profession that has existed since the founding era. I mean, we've cited cases in our opening brief of people hiring professionals to search the records for them before engaging in property transactions. By the late 19th century, you had an enormous industry that was designed to do this. So this isn't — Mr. Herbert isn't someone who's making up some profession. He's part of a very large industry that has done this for a very long time. And that industry, yes, like lawyers depend on courthouses or truckers depend on roads, his industry depends on access to the public archives. And, you know, it's true that now you have these modern public records laws, but I think Virginia's argument would be the same. If you were just talking about can they bar the doors to the archives building? Can they bar the doors to the property records? There's no — I don't see any distinction in context. Is this your privileges and immunities argument or your dormant commerce clause? You know, I think the logic of both arguments are similar, but I think it most clearly is illustrated in the privileges and immunities context where — So then it's not enough that this is a big deal to your client. It has to be something that is essential to hold the country together as a national unit. And it seems to me it's a bit of a stretch to say somebody gathering records about commercial under FOIA fits that description. I don't think it's a stretch at all, Justice — Chief Justice. The aggregators of records make possible mortgage origination, credit reporting, insurance adjustment. The economy — and you have an amicus brief. No, but see, just to get into those, again, I think a lot of those examples, you do have access under other statutes. You talk about mortgage rules and all that. No, no, not to this kind of information. The information that Mr. Herbert is gathering, tax assessment information, is essential to mortgage origination and credit reporting. The people who hire him are large data companies, and the data industry brief explains the uses of this information. That information is essential to these activities. And Virginia, virtually alone among the States, is — is erecting this barrier to access that market and — and reserving the right to access that market to only people who live in the State. And — and, you know, this would be no different if we're just talking about the archives that — that include all the information that the — yes, it's true that Virginia has exempted the title itself, but I don't see that the logic of their position allows them to make that distinction. I mean, that's just a feature of their — of their statute. Sotomayor, I'm still trying to tease out what your claim is. Let's suppose Virginia passes a statute that says we'll let nonresidents have access, but they have to pay all the costs. Nonresidents don't. Would that satisfy you as valid? I think that would be a closer question, but I think that presents some problems as well. I mean, so in your hypothetical, it's free to the citizens of the State, but they're just passing the cost on to out-of-Staters. And, you know, this — this Court in cases like Toomer and Mulaney have said that at least, you know, where the State can show that the nonresidents pose some unique evil, that the State is entitled to pass the costs on. Why isn't it just you just being costing them more? Right. That was Justice Ginsburg's point, which is every time you put in a request, you're costing them more money. Right. But that would be discriminating against noncitizens solely because they're noncitizens. So if there's some particular reason you're costing them more. Right. Well, that's precisely the rationale that, in Justice Kennedy's opinion for the Court in Barnard v. Thorson, this Court rejected. The Virgin Islands wanted to say if we open up our bar to people from all over the country, it's going to increase the administrative resources. And this Court said, no, that's not a good enough reason. That's just discriminating on the basis of citizenship. But if, for example, the State could show that there was, you know, there were shipping costs that were uniquely posed by nonresidents and they wanted to assess a $5 shipping fee for all nonresidents, that might be permissible. And if there are no further questions, I'd like to reserve. Roberts. Thank you, counsel. General Getschel. Mr. Chief Justice, and may it please the Court, the I'm not sure how you save administrative costs under this statute. They could go to any Virginia resident, it's not illegal, and probably will. It will cost them something more, but not you, and get the very same information. So how do you justify this discrimination? Because it's so easily, the administrative cost is going to be imposed anyway. I would suggest that the purpose of the statute, which is political, not commercial, left the State with the position that it was going to subsidize with tax dollars this function, because we can't recover our overhead. We can only recover the actual costs. So you want to give more businesses to Virginia citizens who will now charge out-of-state residents money to process their FOIA requests? No, Your Honor. I don't think anybody was thinking about businesses of any sort. I think they were saying that we have a political hygiene statute. They were very much the fad. It happened in my lifetime, too. I remember when they were adopted. Nobody thought they were commercial in nature. And I do want to repel the notion that there is even substantial discrimination in this case, because Mr. Hurlburt, in his admission that this is an as-a-place challenge, has a difficulty with substantial equality of access, because it turns out that Mr. Hurlburt, in his reply brief, when he teed up the 1786 statute, which does give access, did give access, he focused his argument on that statute. And if you run that statute, you will find that between 1830 — I mean, 1813 and 1840 — that you did not have general access. They went back to having to show a particular interest. But that from 1840, 41 until today, through the codes of 1819 and up until the present code, section 17.1208, he has the right of access to tax assessment records. So the — if I understood your answer to Justice Sotomayor, the only reason you don't let out-of-Staters get these records is because of the added overhead costs? No, Your Honor. It's just not part of the interest the State was trying to serve. The State — No, I know. But why — so why don't you do it anyway? It's just — just as I asked your friend, it doesn't seem like that big a deal. It doesn't seem like that big a deal for you either. If you can recoup overhead costs from people who request, and I assume you'd be able to, why don't other people have it? People from West Virginia may have an interest in how Virginia government operates, too. And again, what cost is there to you other than overhead? You don't want to keep how Virginia government operates quiet from outsiders when you let citizens get the access, do you? The — we are here to defend the decisions of the two lower courts that apply existing doctrine. And under existing doctrine, only if we discover that this is a fundamental right do I have to justify — Well, that's under the privileges and immunities argument. That's correct. Okay. But what about the dormant commerce clause? Under the dormant commerce clause, we would first have to have a regulation of commerce that's discriminatory. And I would say that this is a governmental function. I would say that the — No, I know — I understand your argument. I'm just asking you, why bother? I mean, what's the — and that's certainly pertinent to some of the Commerce Clause analysis. And I haven't heard anything other than the overhead cost, and I think you can recoup that from the requesters. I cannot, Your Honor. Why not? Mr. Chief Justice, the statute says I cannot recoup the cost of maintaining and generating the database, which is by definition overhead. I cannot. Well, you've got to maintain and generate the database anyway for Virginia citizens who are going to ask for it. This is not an added cost. It's an added cost if you have to hire an additional person to handle, as far as I can tell, just these two people. It's an added burden, too. It's not all of it. The Virginia citizens pay for that database, right? They do. This is a taxpayer — And the out-of-staters don't pay for the database. This is a taxpayer-subsidized system. And if besides, do you — is it the law that the State of Virginia cannot do anything that's pointless? Only the Federal Government can do stuff that's pointless? There is a non-financial burden as well, because as one who is subject to FOIA requests, we have a finite number of officials and employees who have to address these things.  Sotomayor, you keep making that argument, but you don't stop residents from asking for the information from someone else. I mean, that's one of the points of your law, which is they can hire a Virginia resident to get it for them. Most of the big people are doing that already. So you're not saving any money if they can get the information simply by paying someone in Virginia to get it for them. In fact, the State of Virginia has made the policy decision to give this information to its citizens and not to inquire behind it to see whether or not somebody is doing it for an out-of-stater. Or even for commercial purposes. Don't you think if those who created these government-in-the-sunshine laws could have drafted them in such a way that inquiries for commercial purposes would not be allowed, but only those inquiries that are intended to look into the workings of State government and produce government-in-the-sunshine? Don't you think that they probably would have excluded commercial inquiries if they could? But you can't tell which ones are commercial and which aren't. And we don't try. We have a policy decision that we want to have a very simple system that allows our citizens to make inquiries without a demonstrated need or cause, because we want there to be sunshine. It's no more complicated a system if you let out-of-staters have access to. You say we want a simple system. It's going to be the same system whether you win or lose. The thing that is of great concern, why do we care, why do we bother, is the principle that when a government is providing a taxpayer-subsidized service of recent origin to its citizens, that it does not have to explain its choice either under the Privileges and Immunities Clause or under the Dormant Commerce Clause. It is very important that we not find ourselves with lawsuits that say services, voluntary services, are in fact things that now have to be justified under those two provisions of the Constitution. Breyer. That's where he comes in with his argument, because I agree. You can you don't have, let's say, the most fabulous reason for doing this, but you have a reason. And so the question is, does it have to be better than that? And they're saying yes. And as I heard it, what I would characterize as a strong argument, sort of first of all strikes me as a stronger argument, is that, look, if we go back into history, out-of-state real estate people could always get information about property, let's say they had a client who wanted to buy it. Now, you've protected that. But in today's world, it's important that we get statistics about this, too, because our economy is national. If we understand how States are taxing their real estate, we will know to what extent they increase the value, to what extent they increase the rate, to what extent they really get the money they're supposed to, to what extent they might get money or not get money in the future. And all those things are nationally important so that people can put them together and make better than we have done in the past predictions about what is likely to happen to States and, hence, the national economy. All right? That's the kind of argument he's making. And he says, so therefore, there is a national interest in the flow of this information. And that means you have to have a better than mm-hmm kind of rationale. That's what he's saying, I think. Scalia. But it's very difficult for Mr. Hurlburt to make that fairly expansive argument, because it turns out that he's not. Breyer. Well, to be fair, I was sort of expanding it. But in point of fact, because he is entitled to the tax assessment data in the clerk's office, in the case of Henrico County, where he went, you go in the same building, and if you're Mr. Hurlburt, you turn in one direction, you go to the clerk's office. And if somebody in Virginia wants to, for whatever reason, get it from the tax assessor's book instead of from the clerk's book, you turn in the other direction. But you don't deny that, in general, this does affect out-of-State data collectors, people who are engaged in the kind of business that Justice Breyer was talking about, is that right? I have no idea in this record, because we were on summary judgment, cross-motions for summary judgment. And the district court and the court of appeals, both in our judgment, correctly ruled that there's a two-step inquiry. And the first step is whether or not there is a fundamental right. And in the absence of a failed- Sotomayor, Justice Sotomayor, it's only in his privileges and immunities claim. He claims that the dormant commerce clause has been affected because he reads this statute saying only Virginia recording companies have access, out-of-State can't. And it's a fair reading of the statute. It only permits Virginia residents, which include commercial and noncommercial, to access the information. So assume, hypothetically, that the statute reads only Virginia commercial businesses have access to this information. If, in fact, you want to rewrite the statute subject to it to attack, obviously that would then raise questions about a nongovernmental protectionist intent. But that's not the way this statute was written. It's not how it was crafted. It has nothing to do with commerce. Sotomayor, Justice Sotomayor, that's the question I'm raising the best argument for your adversary, okay? Because we could call it a direct – he calls it direct discrimination because commercial businesses are being permitted in Virginia, but not noncommercial. You say it's indirect. How do we draw the line between direct and indirect when the bottom line consequence is the same? I would have about three answers to that. The first one is that we don't trigger the Dormant Commerce Clause analysis unless we are exercising the police power of the State to regulate commerce. And that means that not every statute a State passes triggers inquiry, even if it has an indirect effect on commerce. Whereas here, we have a statute that has a solely political intent. The fact that now that the amici want to tell us about this great burgeoning enterprise, they want the Court to take that into account. Kennedy, are you telling us that there is simply no commercial consequences to this statute at all? That Virginians find this to be of no commercial value in any instance? I am totally agnostic on this record because we don't have any data on that. Well, you were the one with summary judgment. Now, maybe they didn't come forward with the information, but we interpret summary judgment in favor of the losing party. But you're – so you say you're totally agnostic. I'm concerned that you're preventing them by the summary judgment from showing that there, even with Virginians, there's a commercial value frequently to this information. It's not just political. On this record, on this record, the position that was accepted by the two courts below entirely in accordance with this Court's existing doctrine was the first inquiry under privileges and immunities was whether there was a fundamental right. If there is not, then we make no further inquiry. Let's talk about the commerce clause. You're saying you're agnostic. You have no idea of whether or not there might be some commercial value to this information. I would think as an officer of the State of Virginia or as a matter of judicial notice, we could take notice that there is. I'm saying under this record that never came up, nor should it have come up, because what the Court said on dormant commerce clause, both of the courts below, was this is not a regulation of commerce, it is a governmental act. You're saying that it's no more necessary for you to show that there's no commercial value to allowing out-of-Staters to do this than it is necessary for you to show that there is no commercial value to your not allowing out-of-Staters to hunt deer in Virginia. You say that it's up to Virginia whether out-of-Staters can hunt Virginia game, and it's up to Virginia whether out-of-Staters can have access to the State's records that they have no interest in personally under this law. It seems to me perfectly logical. But remember, they do have access to this information, both Hurlburt and McBurney. Of course, that assumes the question as to whether or not there is a general commercial interest in these documents. And you say, oh, you're agnostic. At least that means you're open to the possibility that there might be a commercial interest. Harris. Here's the problem in this case, is because I think that we are not at first-tier analysis, because there's no regulation of commerce that's discriminatory. Scalia. I didn't understand. If that's your argument, I reject it as Justice Kennedy does. I didn't understand you to be arguing that there is no commercial value. I'm trying to explain why it doesn't matter. Yeah, that's what I thought. It doesn't matter because if on the threshold inquiry we don't have a discriminatory regulation of commerce, but just an ordinary governmental function, then only Pike Church analysis could possibly carry. You can't say discriminatory regulation. What about a tax? I mean, you can't tax discriminatorily, and I wouldn't call taxation in and of itself a regulation of commerce, would you? The fact of the matter is that it has been — taxes have been found to be both violations of privileges and immunities and dormant commerce clause, where there was unequal taxation of commerce. Even though it's not a regulation of commerce. Okay. Well, I've apologized. I chose a word that is not as apt as it should have been. But a regulation or a taxation centering around commerce intended to affect and actually affecting commerce, it just — this just isn't that kind of activity. Could you just indulge me with a hypothetical? Suppose that the background for these statutes was different. The statutes were the same, but in addition to talking about people's right to know about how their government works, could people spend a lot of time also talking about the economic benefits of a free flow of information in our country? Would that — if that were true — I want to put myself on record as not remembering when these statutes were passed, you know. But if that were true, would this case be different, or would you still be up here saying the same thing? If I had a statute which on its face dealt with commerce, I would— The statute, it does exactly the same thing. I'm just suggesting that there might be two interests behind the statute. One is about knowing the way your government operates, and the other is about free flows of information. And if both of those things had gone into the mix to create statutes of this kind, would you be up here saying the same thing or not? I would be saying something at least slightly different if I had different facts that I had to deal with. But I think in principle, I would be arguing the power of the State to pass this kind of act without having to submit to a Dormant Commerce Clause, at least first here, Dormant Commerce Clause analysis. Ginsburg. What else can Virginia do besides, I don't know if there are elves in Virginia, but besides to reserve for its own, for its own people? You say this is, good government in Virginia is for Virginians. Big game hunting, scarce resources can be reserved for in-State people. What else can Virginia do? Well, Virginia can do things including have in-State tuition. It can have, it can subsidize its own businesses either by training programs or even by other direct subsidy from the public fisc. It limits welfare payments to residents of the Commonwealth. When the Commonwealth is just acting as a government and not as a regulator or taxer of inter-State commerce, it has the status of a co-equal sovereign that in its own sphere is allowed to do its own policy choices. I think the thing, General, that I was trying to get at was it seems to me you have a very good case that these statutes were meant for a different purpose. But in fact, it seems as though your friends there have a good case that these statutes have been taken over to a large extent across the country by economic enterprises doing economic things. And at that point in time, Virginia's, and, you know, you're only one of two states, Virginia's maintenance of this kind of, no, it's Virginians, you know, Virginia information for Virginians looks very different from what it might have looked like when the statute was originally passed. If we were going to say, if you were going to say that this is an inquiry that needs to be made under the Commerce Clause, this would be a particularly poor vehicle for doing it because the Fourth Circuit held that the Pike analysis of the district court was not appealed. And therefore, this case could not be sent back on remand to develop a burden analysis or record for burden analysis. Kennedy, but the Pike is not relevant here. Pike involves, this was the Southern Pacific versus Arizona, where there were melons, where there were melons, and Arizona wanted to make sure that you had labels and packing of the melons in Arizona. That was discriminatory against interstate commerce. That's not dormant Commerce Clause. But that is discrimination. And there's discrimination here. Well, there's discrimination only in the sense that we discriminate against people who we don't let vote because they don't live in the Commonwealth as well. I mean, this statute has a function. It's a legitimate function. Kennedy, you could say the same thing. We don't discriminate against Californians who want to come and pack their melons in Arizona. Well, I would say that whether or not somebody can deal with an item in commerce is raises Commerce Clause questions. And just like in Reno v. Condon, where the State of South Carolina was choosing to take its records and sell them into the stream of commerce, there the Court held that they thereby became a thing in commerce. The records of the tax assessor of the County of Henricov, which are available through the clerk's office to Mr. Hurlburt, are not things or persons in commerce, nor are they instrumentally protected. It would surprise me if an out-of-state investor who was thinking of putting a large plant in Virginia had absolutely no interest in Virginia's tax policies. But they're available. They're publicly available. They're just not available through this adjunct service. All FOIA is, is a device where you don't have to go and look. There's always been public access for these records. Breyer, I think they have an argument, say, of course, this information would be useful for gathering national statistics and helping the national economy. I think that's true. On the other hand, you say, well, but look, there must be something left that States can reserve to their own citizens. There must be something. They can't protect their own commerce. That's clear. They can't discriminate against people who want to come in and live here. That's clear. They can't do this and that and the other thing. But, gee, there must be something. I mean, can't they reserve at least their beaches for their own citizens? No. Parking near their beaches? Well, maybe. And maybe deer, and if not this, what? That's the end. Okay? So that's basically what you're saying. This is just an interest in trying to find out how State institutions work, and the voters have the main interest there, and this is other. So you say the other one is attenuated but not nonexistent. He says the other is important, though he recognizes States should be able to do something. So if you were me, how would you decide? How would you choose? What's the standard? Because you know the Privileges and Immunities Clause is considerably opaque, and there are very few cases on it. And so how would you tell me to resolve that tension? Because there is a tension. I think that the important policy issue in this case for us is precisely as you articulated. There is residual sovereign power in the State to act, and we have to violate the Constitution clearly before we lose that authority. And under existing Privileges and Immunities doctrine, the privileges and immunities are few. They have been enumerated in the courts. They are similar in character, having to do with commerce, not governmental action. So I would say you would not extend privileges and immunities. Scalia, we're talking about State-owned documents, aren't we? Yes, Your Honor. There's not much that's as close to the sovereignty of the State as the possession and right to exclude people from its own records and its own documents, right? I agree. So the issue is can the State allow its own citizens, for purposes of seeing that the government is being run on the up-and-up, have access to those documents without letting the whole world? Yes, Your Honor. That is our position. So why doesn't the Darman Commerce Clause affect the hypothetical I laid out? Because directly this permits Virginia commercial businesses to get something that out-of-Staters can't. The State is putting this instrument into commerce. You say I don't know that. But make the assumption that we think the record is clear enough on that point. I know you want to fight me on that, but it's hard. It's a fight with no legs, because you have to know that commercial enterprises in Virginia seek these records. I'm arguing that, of course, I think we say in our brief that they can be put into commerce, they are put into commerce, but we don't put them into commerce. And we have, in the architecture of our bill, our act, has nothing to do with commerce. And if a State can't deal with it. Tell us under our jurisprudence, the Dormant Commerce Clause jurisprudence, and I have some colleagues who don't believe it should exist, take that argument out. Why is this not a Dormant Commerce Clause case? Because it is not an exercise of the State police power to regulate commerce. The documents in the Tax Assessor's Office of the County of Henrico are not things or persons in commerce, nor are they channels or instrumentalities of commerce. They are just the records of the sovereign, which we will allow our citizens to obtain. Unless the Court has further questions, I think this argument has been developed from our standpoint. Thank you, General. Mr. Gupta, you have three minutes remaining. Thank you. Just a few quick points. First, I just want to clear up on the statute. I want to make it clear that this statute does allow the State to fully recoup its costs, including administrative costs, and the State hasn't said otherwise. And secondly, the suggestion has been made. Excuse me. I think what he's saying is you don't have to pay the costs of developing and maintaining those records, which costs are paid by the citizens of Virginia, which gives them an additional interest in being able to get to those documents. You don't claim that you pay for the development and the maintenance of those records. You just pay for the incremental cost of giving it to you, right? That's right, Justice Scalia. And Virginians pay for all the rest. That's right, Justice Scalia. And that's true of other things like roads and courthouses. And I think this gets to Justice Breyer asked for a test to try to differentiate this from other services. I'd like to try to provide one. I think at least where you've got a function that's reserved to the State, only the State can do it. Only the State can run the archives. It's necessary as a channel to commerce. And in the modern economy, this is as much part of the information infrastructure as transportation is, like courthouses, like archives, like roads. It would not stretch limited resources. It would not cost the State additional money. And it would not jeopardize important local traditions or institutions. And I think you can feel comfortable. Ginsburg. Are you leaving it? You switched now to the Dormant Commerce Clause. What about your other client, McBurney? He doesn't have any Dormant Commerce Clause claim. Right. I think the test I just laid out would work for both clauses. It's a limiting principle on the justification side. But that's right. Mr. McBurney does not have a Dormant Commerce Clause claim. His claim is based on equal access to proceedings. He wanted to get recovery of child support that he was owed, so he is a creditor seeking to pursue a debt on equal terms with people in the State of Virginia. And the State set up a process. As one step along the way to court, you go to the agency, you ask the agency to enforce. The agency has unique enforcement tools. It can suspend someone's driver's license, for example. It can intercept income tax refunds, and it can go to court on your behalf. And all he's asking for is the rules of the game. He wants to know what procedures apply to that process, and at least where an agency has a process that directly affects a non-Stater in the pocketbook. All we're saying is that equal access to the proceedings means equal access to the information governing those proceedings. And finally, I'd just like to close by saying that, you know, what I don't think we heard on the justification side from the State was really any justification, because the State can recoup its costs, and so they're not saying that this will cost them anything more, which was the only justification they pressed in the courts below, and so they are left with the position that they can discriminate simply because they think they can. And if you look at the Privileges and Immunities Clause, it sits right next to the Equal Faith and Credit Clause, which indicates, if anything, that the Framers thought that the movement of public records across State lines was important to interstate comity. They changed the Articles of Confederation version, which did not include public records. It only referred to judicial records. They added a mention of judicial record — nonjudicial records, and saw that that was important to — to comity across State lines. But — but their position is about the step before that. It's about whether you get the records in the first place. Thank you. Roberts. Thank you, counsel. The case is submitted.